[Cite as *State v. Crawford*, 2022-Ohio-2673.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 110986 |
| v. | : | |
| HORACE CRAWFORD, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 4, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-657218-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Glen Ramdhan, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Horace Crawford ("Crawford") appeals from his convictions and sentence for rape and other charges following a jury trial. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} On February 26, 2021, a Cuyahoga County Grand Jury indicted Crawford on three counts of rape in violation of R.C. 2907.02(A)(2), three counts of sexual battery in violation of R.C. 2907.03(A)(5), and one count of kidnapping in violation of R.C. 2905.01(A)(4) with a sexual motivation specification. These charges stemmed from Crawford's sexual abuse of his then 15-year-old daughter, A.H.

{¶ 3} Crawford pleaded not guilty to these charges. On June 18, 2021, the case proceeded to a jury trial.

{¶ 4} The state called Miranda McCoy ("McCoy"), who testified that she had dated Crawford from approximately July 2019 to December 2019. McCoy testified that when she asked Crawford about his daughter A.H., who was 15 years old at the time, Crawford said that she was "sexy," which McCoy found strange. McCoy also testified that Crawford smoked marijuana with A.H., which McCoy found inappropriate.

{¶ 5} The state also called Candace Hinton ("Hinton"), who testified that she dated Crawford in December 2019. Hinton described a night, around Christmas 2019, when she and Crawford had gone to a friend's house for game night and A.H. stayed home at Hinton's house. A.H. called and texted Crawford that she was sick, so Crawford and Hinton returned home. Crawford stayed on the living room couch with A.H., telling Hinton to wake him up to come to bed if he fell asleep on the couch. Hinton woke up between 4 and 5 a.m. and went into the living

room where she observed Crawford and A.H. sleeping together on the couch in what she described as an "alarming" way, with A.H.'s head in Crawford's lap. Hinton woke up Crawford, who came into the bedroom with her, but shortly thereafter went back to the living room with A.H.

{¶ 6} The next morning, Hinton observed a white stain on one of the couch cushions where Crawford and A.H. had been laying; she testified that the stain looked like semen. When Hinton confronted Crawford about the stain, he said that it looked like vomit. Hinton disagreed and took pictures of the stain and Crawford's pants, which also had a white stain.

{¶ 7} The next day, Hinton, Crawford, and A.H. were watching a movie together on the couch. When A.H. got up to go to the kitchen, Crawford told A.H. that she was "thick as f**k," which upset Hinton.

{¶ 8} The day after that, Hinton looked through A.H.'s cellphone because she had previously noticed the two of them sending text messages to each other when they were in the same room. Hinton testified that she saw a message that A.H. had sent to Crawford asking if he had ejaculated inside of her because she thought she might be pregnant. Hinton used her cellphone to take photos of messages on A.H.'s cellphone. The state introduced these photos as exhibits at trial. Hinton testified that she then confronted Crawford, who denied her accusations and left Hinton's house with A.H. Hinton then called the police.

{¶ 9} The state called Stephanie Moore ("Moore"), a child protection specialist in the sex abuse department of the Cuyahoga County Division of Children

and Family Services ("CCDCFS"). Moore testified that her job involves assessing the safety of children within their home and conducting forensic interviews with alleged child victims. Moore explained that she often encountered delayed disclosure, where feelings of shame, confusion, or fear may prevent a child from being forthright about an assault early on. Moore also explained that it was common for the perpetrators in her cases to be a family member or otherwise known to the victim prior to the incident.

{¶ 10} Moore testified that she received a referral regarding allegations that A.H. was being sexually abused by her father, Crawford, in January 2020. Moore reached out to A.H.'s mother, K.H., and set up a time to conduct a forensic interview of A.H. Moore testified that during the forensic interview, A.H. reported that some inappropriate things had happened with Crawford. Moore went on to explain that due to concerns surrounding A.H. repeatedly leaving school and her home and communicating with Crawford, as well as concerns surrounding K.H.'s significant health issues that caused K.H. to be hospitalized, A.H. was placed in CCDCFS custody and ultimately placed in a foster home in Columbiana County on February 5, 2020.

{¶ 11} Moore testified that she drove A.H. to her foster home, checked that the home was safe, and then returned a week later for a follow-up visit. At the follow-up visit, Moore was accompanied by two Cleveland police detectives who set up a camera to film Moore's conversation with A.H. but were not present for the interview. At this visit, A.H. spoke more openly to Moore about what had happened

with Crawford, began crying, and asked Moore if she could write down what happened to her rather than verbalize it. In this way, A.H. disclosed to Moore that she was sexually abused, in the form of digital and vaginal penetration, by Crawford. The state introduced A.H.'s handwritten statement at trial. Moore testified that as a result of this interaction with A.H., she worked with the foster mother to coordinate follow-up mental health and STD testing services. Moore testified that ultimately, as part of her investigation, she made a substantiated finding that A.H. had been abused, meaning that she determined that A.H. disclosed credible information that she had been abused and there was other information that would support that the abuse took place.

{¶ 12} The state also called A.H.'s foster mother, Marsha Cleveland ("Cleveland"). Cleveland testified that A.H. was placed with her in February 2020. Shortly after A.H. arrived at Cleveland's home, she confided in Cleveland regarding her abuse. Cleveland subsequently took A.H. to the doctor. Cleveland testified that A.H. went home on October 7, 2020, to be reunified with her mother.

{¶ 13} Midway through trial, on Friday, August 20, 2021, the parties addressed an issue on the record outside of the presence of the jury. The previous evening, the assistant prosecuting attorney had met with A.H.'s mother, K.H., who was set to testify as a witness in the state's case. During the meeting, K.H. went to the bathroom and became violently ill. K.H. returned to the assistant prosecuting attorney's office with no mask on and informed him that she had just vomited. K.H. proceeded to go home and test positive for COVID-19. The assistant prosecuting

attorney informed the court of this situation, and the court instructed the attorney not to return to court until Monday, provided he tested negative for COVID-19 on Sunday.

{¶ 14} In light of the court's instruction that the assistant prosecuting attorney not enter the courtroom, a different assistant prosecuting attorney appeared in court on August 20, 2021, and the following exchange took place:

> PROSECUTOR: So at this point, we need to — the [s]tate needs to know from the [c]ourt exactly what the parameters and rules are for when [the assistant prosecuting attorney] can return, also what the plan is for the exposure, both to the mother of the victim and the victim, as both are clearly necessary witnesses in this trial.
>
> THE COURT: They are clearly necessary [witnesses]. They can appear by Zoom.
>
> The defense may argue that's unfair. You want them here in person so the jury can see them.
>
> Hey, I didn't [create] a pandemic. This is a situation I'm dealing with, and an appellate court — many appellate courts will be dealing with this issue across the country.
>
> DEFENSE COUNSEL: May I reply?
>
> THE COURT: Yes.
>
> DEFENSE COUNSEL: I am at peace with whatever path you take. We're not asking for anything other than to continue with this trial. But it is worth noting that our [acquiescence] to have these two doctors testify via Zoom as a convenience and a stipulation is in no way indicative of our ability to attempt to stipulate that these witnesses, [K.H. and A.H.,] these facts intensive witnesses, to come and talk in this courtroom.
>
> I'm asking the [c]ourt not to have them testify via Zoom, and that's, by the way, why [an additional defense counsel] is here and follow-up if you require further elaboration on this point.

We would object to having them testify via Zoom. It's violative of, number one, his right to effective assistance of counsel, which the Sixth Amendment guarantees, as well as the right of confrontation in both the Ohio and the United States constitutions.

Thank you.

THE COURT: All right. I understand that, and that is an issue, but I also have a trial on the way and I don't think that I can have a jury wait two weeks on the chance that either one of them will be healthy enough to come back in and resume testimony. [Defense counsel 2?]

DEFENSE COUNSEL 2: Yes, Your Honor. If the Court pleases. With respect to — my understanding is that it was the alleged victim's mother who got sick in the prosecutor's office yesterday.

THE COURT: Yes.

DEFENSE COUNSEL 2: So to start with, if we can divide these two witnesses up, may I inquire as to the basis for believing that the alleged victim cannot come to court just the same way that the prosecutor could join us on Monday. I'm just —

THE COURT: No, no, I understand. The mother tested positive. She is not coming into our courtroom. She can appear by Zoom. If [A.H.], as with [the assistant prosecuting attorney], tests negative, she can come in. If she doesn't, that's why I'm saying then she may be appearing by Zoom.

Again, this is not a perfect solution to a case. I wish we were two years ago and we would have everybody here. They'd all have a chance to talk, the jury could deliberate and we'd have a result based upon a neutral and fair trial. I think the parties still get a fair trial, but these are just awkward circumstances. [Prosecutor]?

PROSECUTOR: So essentially, Your Honor, then we're just — the State would obviously ask for a reasonable continuance until Monday so that the prosecutor who is assigned to the case, you know, can return to trial. Also just looking for some guidance if, in fact, it were to result a different way, if [he's] getting tested, say, on Sunday, you know, just the path forward at that point, you know, what we might need to do.

So, you know, for right now, I'm just trying to establish what exactly are the ground rules here and what then can the State do to work with them?

THE COURT: The ground rules are that in an abundance of caution, I'm not permitting him to come in here.

PROSECUTOR: Okay.

THE COURT: My understanding is that the alleged victim's mother vomited, came into his office in close proximity to him for a period of time without a mask, and he's like, you need to go home.

PROSECUTOR: Yes.

THE COURT: But that, to me, is a high-risk situation for him. If he is tested – so it would be three to five days they say you should be tested, if he tests negative on Sunday or Monday, then he can be back here.

PROSECUTOR: Okay.

THE COURT: I'm not trying to prevent anybody or cause undue hardship for any party, all right?

The parties then continued to discuss the logistics of what, if anything, could take place that day in the absence of the assistant prosecuting attorney who had been assigned to this case since February 2020.

{¶ 15} Ultimately, the state requested a continuance until Monday, August 23, 2021, defense counsel objected to any witnesses other than the two expert witnesses testifying via Zoom, and the court granted the state's request to continue the case until Monday.

{¶ 16} On Monday, August 23, 2021, the assistant prosecuting attorney returned and resumed his presentation of the state's case. The state called Dr. Kristi Johnson ("Dr. Johnson"), an obstetrician and gynecologist employed at the

Columbiana County Community Action Agency in Lisbon, Ohio. Dr. Johnson testified that she met A.H. when Cleveland brought her in for care in February 27, 2020. Dr. Johnson also met with A.H. two weeks later for a follow-up appointment, at which point she informed A.H. that she had tested positive for bacterial vaginosis and herpes. Dr. Johnson testified that the primary method of transmission is sexual, but you can get herpes through nonsexual touching.

{¶ 17} The state also called Andrea Eshelman ("Eshelman"), a nurse practitioner also employed at the Columbiana County Community Action Agency. Eshelman testified that she saw A.H. when Cleveland brought her in for care because she was not sleeping well and she was withdrawn following a trauma. Eshelman testified that Cleveland told her that Crawford had raped A.H., and A.H. subsequently confirmed this to Eshelman. Eshelman prescribed A.H. medicine for depression, anxiety, and trouble sleeping. Eshelman testified that she had two in-person appointments with A.H., followed by three or four telehealth appointments.

{¶ 18} Dr. Johnson, Eshelman, and Cleveland testified remotely via Zoom without defense objection.

{¶ 19} The state also called Patricia Wolanski ("Wolanski"), a lab supervisor at MetroHealth. Wolanski testified that on October 15, 2020, she conducted a pathology test on Crawford; the results of the test showed that he was positive for herpes.

{¶ 20} On August 24, 2021, the state informed the court that it had received documentation confirming K.H.'s COVID-19 diagnosis and recommending that she

isolate for 14 days, signed by a nurse practitioner. Defense counsel renewed their objection to K.H. testifying remotely via Zoom. The court overruled this objection.

{¶ 21} K.H., testifying remotely via Zoom, stated that she was A.H.'s mother and that Crawford was A.H.'s biological father. K.H. testified that she and A.H. had not seen Crawford for some time until November 2019, when he began trying to spend more time with A.H. K.H. testified that she allowed this because she wanted A.H. to have a relationship with her father and thought that it would be good for her. K.H. explained that she and Crawford communicated primarily through text messages, and that around December 2019 and January 2020, some of the messages Crawford was sending seemed "off" or "unusual."

{¶ 22} K.H. testified that around Christmas 2019, she received a text message from Crawford saying that his girlfriend — Hinton — was upset with him and telling lies because Crawford was "trying to cut her off." Specifically, Crawford said that Hinton was alleging that he had sexual contact with A.H. K.H. testified that initially, she did not believe this, and she continued letting Crawford have visitation with A.H. K.H. testified that she began noticing changes in A.H.'s personality and behavior, such as A.H. not listening to her and spending more time outside of the house. At one point, A.H. ran away, and when K.H. told Crawford this, he told her not to look for A.H. or call the police. When A.H. had been gone for approximately one week, K.H. realized that she was with Crawford. K.H., who has lupus, was hospitalized when A.H. got home, and K.H. had someone bring A.H. to the hospital.

{¶ 23} K.H. also testified that she found A.H. with a cellphone. Upon looking through the phone, K.H. realized that A.H. had been using this phone to covertly communicate with Crawford.

{¶ 24} The state also called A.H. She testified that she started spending time with Crawford in late November 2019, when she was 15 years old, and she was happy to spend time with him because he had not been around much prior to that. A.H. testified that she began spending most weekends with Crawford. She testified that while they would eat together and visit her family, they also "smoked together, and we did stuff that a dad wouldn't do with his kids."

{¶ 25} A.H. testified that she had spent a weekend at Hinton's house in December 2019, and after that weekend, she had to talk to a police detective. A.H. testified that initially, she did not tell the detective about anything inappropriate that had happened with Crawford because she was scared and did not want to get him in trouble.

{¶ 26} A.H. described getting into an argument with K.H. and leaving, testifying that she called Crawford when she left. A.H. testified that when she returned, K.H. took her to the hospital, but she again did not tell anyone the truth about what had happened with Crawford. A.H. also testified that K.H. had purchased a cellphone for her, but that phone was taken away as a punishment, and subsequently, her half-brother's mother had given her a second cellphone, that she used to secretly communicate with Crawford. A.H. testified that when K.H. found

the phone, she tried to get it back quickly because if K.H. saw what was on the phone, "then she would know everything."

{¶ 27} A.H. testified that she was placed with Cleveland and stated she felt comfortable with Cleveland and eventually confided in her, telling her that she and Crawford "had sex at a couple of his girlfriends [sic] house." A.H. also testified that she subsequently told Moore what had happened as well, and testified that she wrote out a statement. A.H. read her handwritten statement, in which she described that Crawford digitally penetrated and engaged in vaginal intercourse with her.

{¶ 28} A.H. went on to testify about another incident at Crawford's girlfriend's house, in which Crawford came into the room with her, locked the door, did not let her leave the room, and vaginally raped her. [1] A.H. testified that after this incident, Crawford took her to the store to get a douche so "there wouldn't be any trace" and then took her to someone's house so that she could use it. Crawford told A.H. not to tell anyone what had happened and said that things would be bad. A.H. testified that these threats from Crawford were the reason she initially lied to

---

[1] A.H. provided conflicting testimony about where and when this incident occurred. Initially, A.H. testified that she could not remember where this incident took place. At another point, she testified that it took place at "Miranda['s] house," possibly referring to Crawford's ex-girlfriend Miranda McCoy. A.H. testified that before this incident occurred, she and Crawford smoked marijuana together, which McCoy testified that she had seen. However, A.H. also testified that this incident took place in late December 2019, which, according to McCoy's testimony, was after McCoy and Crawford ended their relationship.

the police as detailed below in the discussion of Cleveland police detective Richard Tusing's testimony.

{¶ 29} A.H. also testified that Cleveland took her to the doctor, where she was diagnosed with herpes; A.H. testified that Crawford gave her herpes.

{¶ 30} A.H. testified regarding the text messages she exchanged with Crawford, confirming that she sent him a message asking if he ejaculated inside of her because she was concerned that she might be pregnant. Subsequently, A.H. messaged Crawford to tell him that K.H. was taking her to the hospital, to which he responded that if they tried to give her a pregnancy test, not to let them. A.H. testified that Crawford then told her to erase their text messages.

{¶ 31} Cleveland police detective Richard Tusing ("Detective Tusing") testified that he had previously worked in the sex crimes and child abuse unit. Detective Tusing testified that he was experienced in forensic interviewing with alleged child victims. He testified that he was assigned to this case in January 2020, at which point he reached out to Hinton, who sent him the photos she had taken of messages on A.H.'s phone. He subsequently reached out to K.H. and set up a time to interview A.H. and K.H. Detective Tusing testified that in his first several interactions with A.H., she was not forthcoming. He explained that this was not unusual with child victims of sex crimes.

{¶ 32} Detective Tusing testified that in February 2020, he traveled with Moore to A.H.'s foster home and set up a camera for Moore's interview. He also

testified that K.H. gave him the Samsung cellphone that she had discovered A.H. using, and he turned that phone over for forensic examination.

{¶ 33} Timothy Clark ("Clark"), a special investigator for the Cuyahoga County Prosecutor's Office, testified that he received a Samsung cellphone from Detective Tusing for examination. Clark testified that because the charging port on the phone was damaged, he was unable to use a software program to digitally extract data from the phone. Instead, Clark took photos of messages on the phone.

{¶ 34} At the close of the state's case, defense counsel made an oral motion for acquittal pursuant to Crim.R. 29. The court denied this motion. The defense rested without calling any witnesses or presenting evidence, and defense counsel renewed its Crim.R. 29 motion. The court again denied this motion.

{¶ 35} The jury began deliberations on August 25, 2021. On August 27, 2021, the court addressed an issue that had arisen the previous day, August 26, on the record. The bailiff stated she was called to the jury room in the afternoon on August 26 and upon reaching the jury room, the bailiff observed juror No. 10 running out of the room, crying and upset. The bailiff brought juror No. 10 to her office to regain her composure. Juror No. 10 then refused to return to the jury room. The bailiff then decided to release the jury early, informing juror No. 10 first and then returning to the jury room to inform the other jurors that they were released and instructing them to report the next morning. The state and defense counsel agreed that deliberations should continue without any additional action by the court.

{¶ 36} Later that day, the parties went back on the record to address a jury question from the foreperson: "we have a juror that is asking to be excused and they are saying they are set on that, even though we have tried to work through our problems." The court then addressed the jury and asked if they have been discussing the case, and if they believe that further discussion of the case would be helpful. All jurors except juror No. 10 indicated that they believed further discussion of the case would be helpful. The court then sent the jury, with the exception of juror No. 10, back to the jury room, and proceeded to question juror No. 10 individually. The following exchange, in relevant part, took place:

THE COURT: And are you the person that they are referring to as asking to be excused?

JUROR NO. 10: Yes.

THE COURT: Could you maybe — and, again, we must not know the status of the deliberations.

JUROR NO. 10: Uh-huh.

THE COURT: But why do you feel that you can't continue?

JUROR NO. 10: Well, I might cry, just so you know. I feel I'm in a hostile environment. The first day I made a comment because we are supposed to be discussing things and somebody flung a paper at me. One of the things I pointed out — we talked about evidence and everybody pointed out that it wasn't introduced in evidence, but it's written on a paper. And you guys gave us that because it's evidence. So I'm looking at that as the way I'm feeling and talking. And I think — I mentioned one of the things on the board, I think it was written down by the defense attorney, about, well, you know in our everyday life —

THE COURT: Right.

JUROR NO. 10: — and I was just shut out about that. I have been accused of being sexist and racist. And, again, I thought we were

supposed to be talking about things. So I have been accused of that. And we were supposed to talk about it today. And it didn't stop. I feel some of the comments that the jurors are making are inappropriate and I don't know how much detail that you want me to get into.

* * *

THE COURT: But do you think you can fulfill that duty and continue to deliberate, listen, and vote your conscience in conjunction with listening to others?

JUROR NO. 10: I would say no, because I still feel I'm being put in a hostile environment.

THE COURT: So you think that you would not be able to continue and make a fair decision in this matter?

JUROR NO. 10: I don't know how that's possible with how they're acting back there. I mean, I know what I want. I mean, I already know how I want to vote, and I have been wanting to vote, and I don't know how long people need to talk about something to make up their mind. I mean — and then I think —

THE COURT: Well, we have deliberations that go from one day to five or six days.

The court went on to discuss the difficulties of jury deliberations with juror No. 10.

{¶ 37} The state suggested excusing juror No. 10 and bringing in the alternate juror. Defense counsel submitted that the jury was likely deadlocked 11-1 and therefore asked the court to declare a mistrial. The court subsequently addressed the entire jury, reminded the jury to be polite and cordial and admonished them to avoid name-calling or casting aspersions. Ultimately, the court instructed the jury to continue deliberating.

{¶ 38} On August 27, 2021, the jury found Crawford guilty of two counts of rape and three counts of sexual battery, and not guilty of one count of kidnapping

and one count of rape. The court referred Crawford to the probation department for a presentence investigation.

{¶ 39} On September 30, 2021, the court held a sentencing hearing. The court informed Crawford of the registration requirements for sexual offenders. Defense counsel addressed the court. The parties agreed that both rape counts would not merge for sentencing, as well as that two of the sexual battery charges would merge with the rape counts, such that he would be sentenced on two counts of rape and one count of sexual battery. The state addressed the court, stating that A.H. was in the courtroom but chose not to make a statement. The state asked the court to consider imposing consecutive sentences.

{¶ 40} The court ultimately sentenced Crawford to 10 to 15 years on each rape count, to be served concurrently to each other, and 4 years on the sexual battery count, to be served consecutively, for a total aggregate sentence of 14 to 19 years. The court also imposed court costs.

{¶ 41} Crawford appeals, presenting the following eight assignments of error, verbatim, for our review:

> I. The remote testimony of K.H. violated appellant's confrontation rights under the Sixth Amendment to the United States Constitution and Art. I, Sec. 10 of the Ohio Constitution and his constitutional rights to due process and a fair trial where the reason was to accommodate K.H.'s temporary illness but the state was allowed a continuance to enable the prosecutor to appear in person.

> II. The court erred by admitting evidence and testimony that was not properly authenticated and without establishing a proper chain of custody.

III. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

IV. Appellant's convictions are against the manifest weight of the evidence.

V. It was plain error and the appellant's Sixth Amendment right to effective assistance of counsel was violated when evidence was admitted without objection in violation of evidence rules 401, 402, 403, and 404.

VI. Appellant was denied a fair trial when improper statements [were] made during closing arguments in violation of appellant's constitutional rights.

VII. The trial court erred by denying the motion for mistrial based on Juror 10's [disclosures] during deliberations.

VIII. Appellant's sentence is invalid because it was imposed pursuant to the Reagan Tokes Act Amendments, S.B. 201, which violates the United States and Ohio Constitutions.

**Legal Analysis**

**I. Remote Testimony**

{¶ 42} In Crawford's first assignment of error, he argues that K.H.'s remote testimony denied him the right to confront witnesses against him in violation of Article I, Section 10 of the Ohio Constitution and the Sixth Amendment to the United States Constitution.

{¶ 43} We review the question of whether a criminal defendant's rights under the Confrontation Clause have been violated de novo. *In re H.P.P.*, 8th Dist. Cuyahoga Nos. 108860 and 108861, 2020-Ohio-3974, ¶ 19, citing *State v. Smith*,

162 Ohio App.3d 208, 2005-Ohio-3579, ¶ 8 (8th Dist.), citing *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir.2004).

{¶ 44} Under both the federal and Ohio constitutions, a criminal defendant has the right to confront witnesses. Specifically, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him." Article I, Section 10 of the Ohio Constitution states that "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *." While the United States Supreme Court has interpreted the Confrontation Clause as reflecting a preference for face-to-face confrontation, it has explained that the preference "'must occasionally give way to considerations of public policy and the necessities of the case.'" *Id.*, citing *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

{¶ 45} Thus, the right to confrontation is not absolute, and the primary concern of the Confrontation Clause is "to ensure the reliability of evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland* at 845. This court has held that to qualify as an exception to the face-to-face confrontation requirement, "'the procedure must (1) be justified, on a case-specific finding, based on important state interests, public policies, or necessities of the case and (2) must satisfy the other three elements of confrontation — oath, cross-examination, and observation of the witness's demeanor." *In re H.P.P.*, 8th Dist. Cuyahoga Nos. 108860 and

108861, 2020-Ohio-3974, ¶ 22, quoting *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553, ¶ 18, quoting *Harrell v. State*, 709 So.2d 1364, 1369 (Fla.1998), citing *Maryland* at 849-851.

{¶ 46} Here, with respect to the first requirement, the court's decision to permit K.H. to testify remotely via Zoom was justified on a case-specific finding based on important state interests and public policies. Specifically, the record reflects that in addition to long-term health concerns that made her specifically vulnerable, K.H. tested positive for COVID-19 midway through the trial and was instructed by a health care professional to isolate for 14 days. The court considered the risks associated with K.H. testifying in person, noting that doing so would be endangering the court, the parties, and most significantly to the court, and the members of the jury. The court further noted that given the documentation of K.H.'s COVID-19 infection, she would not be permitted to enter the building in light of the rules put in place by the Cuyahoga County Board of Health in response to the COVID-19 pandemic at that time.

{¶ 47} This court has repeatedly held that allowing a witness to testify remotely via video does not violate a defendant's confrontation rights. *State v. Frierson*, 8th Dist. Cuyahoga No. 106841, 2019-Ohio-317; *State v. Sheline*, 8th Dist. Cuyahoga No. 106649, 2019-Ohio-528; *State v. Eads*, 8th Dist. Cuyahoga No. 87636, 2007-Ohio-539. Further, in response to the specific public-health context present in this case, the First District has held that "[p]reventing the spread of COVID-19 is an important public policy that may warrant an exception to face-to-

face confrontation under appropriate circumstances." *State v. Banks*, 1st Dist. Hamilton Nos. C-200395 and C-200396, 2021-Ohio-4330, ¶ 24, citing *United States v. Donziger*, S.D.N.Y. Nos. 19-CR-561 and 11-CV-691, 2020 U.S. Dist. LEXIS 157797, 2 (Aug. 31, 2020). The court in *Banks* went on to ultimately hold that remote testimony did not violate the Confrontation Clause even though the witness who testified remotely in that case did not personally express any concerns about COVID-19, nor was there any evidence that the witness was in a high-risk group for exposure to COVID-19. *Id.*

{¶ 48} With respect to the second requirement, our review of the record shows that K.H.'s testimony satisfied the other three elements of confrontation — oath, cross-examination, and observation of the witness's demeanor. The record reflects that K.H. testified under oath and was subject to cross-examination. The record also does not indicate, nor does Crawford assert, that any party or member of the jury had any difficulty in observing K.H.'s demeanor while she was testifying, given that K.H. appeared on a large video screen in the courtroom visible to everyone.

{¶ 49} Further, while Crawford reiterates potential concerns involved in remote testimony, such as whether K.H. had anyone else in the room with her and whether she would be referring to notes or other inappropriate reference materials during her testimony, nothing in the record indicates that these concerns materialized at trial. The court confirmed with K.H. that no one was in the room with her when she was testifying, and K.H. did not reference anything other than

exhibits that had been sent to her in advance by the state. Indeed, Crawford does not point to anything that presented an actual hindrance of his confrontation rights, nor has our review of the record revealed any such hindrance as a result of remote witness testimony.[2] Further, Crawford asserts that the court could have ordered a continuance to allow K.H. to testify in person, particularly because the court ordered a continuance after the assistant prosecuting attorney was exposed to COVID-19. As a practical matter, we note that there is a significant difference between ordering a one-day continuance to confirm that an individual exposed to COVID-19 has not contracted the virus, and a potentially indefinite continuance to allow an individual to recover from the virus. Furthermore, while the court theoretically could have ordered such a continuance, the Confrontation Clause does not require a court to indefinitely delay a trial — inconveniencing the jury, the court, the parties, and quite possibly prejudicing the defendant — in order to ensure face-to-face confrontation.

{¶ 50} While we agree with Crawford that the case law in this area continues to develop, none of the cases he cited warrant a different outcome in this case. Following a thorough review of the specific circumstances of this case, we cannot

---

[2] We note that Crawford did not object to the remote testimony of Dr. Johnson, Eshelman, or Cleveland, all of whom were permitted to testify remotely in part due to their location in Columbiana County, several hours south of Cleveland. While we are mindful of the relative significance of K.H.'s testimony, we also note that Crawford failed to identify any difference in the remote testimony of these three witnesses compared to K.H. that would amount to a violation of his confrontation rights.

conclude that K.H.'s remote testimony violated Crawford's confrontation rights. Therefore, his first assignment of error is overruled.

## II. Authentication of Evidence

{¶ 51} In his second assignment of error, Crawford argues that the court erred by admitting evidence that was not properly authenticated and without establishing a proper chain of custody. Specifically, Crawford argues that the state's introduction of evidence in the form of numerous text messages and related testimony was not properly authenticated. In the alternative, Crawford argues that the state failed to properly establish a chain of custody for the cellphone. We disagree.

{¶ 52} The decision whether to admit or exclude evidence is subject to review under an abuse-of-discretion standard, and reviewing courts will not disturb evidentiary rulings absent a clear showing that the trial court abused its discretion and materially prejudiced a party. *State v. Barnes*, 8th Dist. Cuyahoga No. 104045, 2017-Ohio-383, ¶ 17, citing *State v. Lyles*, 42 Ohio St.3d 98, 99, 537 N.E.2d 221 (1989).

{¶ 53} Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." To satisfy this requirement, "[t]he proponent must only demonstrate a 'reasonable likelihood' that the evidence is authentic, which may be supplied by the

testimony of a witness with knowledge." *State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, ¶ 65 (8th Dist.), citing Evid.R. 901(B).

{¶ 54} Here, the state satisfied this requirement by introducing testimony from multiple witnesses — Hinton, K.H., and A.H. — that the text messages introduced at trial were text messages between Crawford and A.H. The witnesses identified Crawford's phone number based on their own personal knowledge. They also identified that the Samsung cellphone was A.H.'s, or was regularly used by A.H. A.H. herself testified that she sent and received the messages, as well as how she got the cellphone and how she used it to communicate with Crawford.

{¶ 55} While Crawford points to alleged discrepancies in the record as to the location of the cellphone, the ownership of the cellphone, and the functionality of the cellphone, none of these claimed inconsistencies has any bearing on the state's authentication of the text messages. Even if the cellphone was lost at some point during the investigation, or was purchased by someone other than A.H., that does nothing to undermine the testimony from multiple witnesses authenticating the text messages recovered from the phone.

{¶ 56} Crawford's chain of custody argument is also not well taken. Chain of custody is established by direct testimony or by inference. *State v. Conley*, 32 Ohio App.2d 54, 60, 288 N.E.2d 296 (3d Dist.1971). Here, A.H. testified that she was given the phone by her half-brother's mother and used the phone beginning in late 2019 until her mother, K.H., confiscated it. K.H. then turned it over to Detective Tusing, who in turn delivered it to Clark to conduct a forensic

examination. Even if there was a break in the chain of custody, questions regarding a chain of custody go to the weight, not the admissibility, of evidence. *State v. Pointer*, 8th Dist. Cuyahoga No. 100608, 2014-Ohio-4081, ¶ 30, citing *State v. Richey*, 64 Ohio St.3d 353, 360, 595 N.E.2d 915 (1992).

{¶ 57} In light of the foregoing, we cannot conclude that the trial court abused its discretion in admitting text message evidence. Therefore, Crawford's second assignment of error is overruled.

## III. Crim.R. 29 Motion for Acquittal

{¶ 58} In his third assignment of error, Crawford argues that the trial court erred when it denied his motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt that he was guilty of rape and sexual battery. Specifically, Crawford argues that A.H. was inconsistent throughout the investigation in this case with respect to whether, where, and when any sexual contact occurred. He also emphasizes that this case involved delayed disclosure and besides A.H.'s allegations, "there is no evidence that any of her delayed disclosures are true."

{¶ 59} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37,

quoting *State v. Tenace,* 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 60} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 61} Crawford's argument does not direct this court's attention to any element of any offense for which the state failed to present sufficient evidence. In contrast to Crawford's assertion that A.H.'s allegations are unsupported by other evidence, the record reflects that the state presented ample evidence in the form of witness testimony, text messages, and physical evidence showing that Crawford raped A.H. Further, to the extent that his argument is based on A.H.'s credibility, or lack thereof, this argument is irrelevant to a Crim.R. 29 question and will be addressed more thoroughly in our discussion of Crawford's fourth assignment of error. Having reviewed the record in its entirety, and viewing the evidence in the light most favorable to the state, we conclude that any rational trier of fact could

have found the elements of rape and sexual battery were proven beyond a reasonable doubt. Crawford's third assignment of error is overruled.

**IV. Manifest Weight**

{¶ 62} In Crawford's fourth assignment of error, he argues that his convictions are against the manifest weight of the evidence. Specifically, he argues that the evidence against him — particularly the testimony from A.H. — was poor and unreliable.

{¶ 63} Unlike a challenge to the sufficiency of the evidence, a manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 64} Although we consider credibility when reviewing a manifest weight challenge, "issues relating to the credibility of witnesses and the weight to be given are primarily for the trier of fact." *State v. Matthews*, 8th Dist. Cuyahoga No. 97916, 2012-Ohio-5174, ¶ 34, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). Further, the trier of fact is free to believe all, part, or none of the testimony of each witness. *Id.*, citing *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096

(4th Dist.1992). Therefore, appellate courts will generally defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor. *Id.*, citing *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶ 65} Crawford argues that A.H. admitted that she lied to the police and others numerous times over the course of the investigation in this case. He also points out, presumably to attack A.H.'s credibility, that she exhibited bad behavior that had nothing to do with Crawford. He also reiterates his arguments that the text message evidence was not properly authenticated, and in the absence of such authentication or corroborative evidence, could have easily been manipulated.

{¶ 66} This court has repeatedly held that the absence of corroborative evidence does not render a rape conviction against the manifest weight of the evidence. *State v. Frazier*, 8th Dist. Cuyahoga No. 107680, 2019-Ohio-2739, ¶ 34, citing *State v. Hruby*, 8th Dist. Cuyahoga No. 81303, 2003-Ohio-746, ¶ 12. Furthermore, the state presented evidence at trial in the form of testimony from numerous witnesses that in child sex abuse cases, delayed disclosure is common. The state also presented additional testimony that while A.H. was not initially forthcoming, this is common in child sex abuse cases for a number of reasons, including shame, fear, and confusion. A.H. herself confirmed that she initially lied because was afraid, confused, and did not want her father to get in trouble.

{¶ 67} Having reviewed the entire record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice. Crawford's

convictions were not against the manifest weight of the evidence. Therefore, Crawford's fourth assignment of error is overruled.

**V. Ineffective Assistance of Counsel**

{¶ 68} In his fifth assignment of error, Crawford argues that it was plain error and violated his right to effective assistance of counsel when evidence was admitted without objection in violation of Evid.R. 401, 402, 403, and 404. Specifically, Crawford argues that it was plain error for the court to admit testimony regarding Crawford's marijuana use with A.H. and testimony referencing Crawford's probation officer. He argues that the failure of defense counsel to object to this testimony was constitutionally ineffective.

{¶ 69} Crim.R. 52(B) provides that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." In order to find plain error, it must be determined that, but for the error, the outcome of the proceeding clearly would have been different. *State v. Hostacky*, 8th Dist. Cuyahoga No. 100003, 2014-Ohio-2975, citing *State v. Long*, 53 Ohio St.2d 91, 96-97, 372 N.E.2d 804 (1978).

{¶ 70} Crawford has not established that but for this testimony, the outcome of the proceeding would have been different. McCoy, Hinton, and A.H. testified that Crawford smoked marijuana with A.H. During the state's direct examination of K.H., K.H. described Crawford's comments about Hinton: "what he said was she had been calling around to his probation officer and other people trying to, like, ruin his name and get him in trouble." There was no mention of why

Crawford was on probation, or any additional inquiry or reference to probation or a probation officer. Even if none of the aforementioned testimony had been admitted at trial, the state presented significant and persuasive evidence that Crawford raped A.H. These isolated statements do not amount to plain error.

{¶ 71} The Sixth Amendment of the United States Constitution states that, "in all criminal prosecutions, the accused shall enjoy the right to [* * *] have the assistance of counsel for his defense." The United States Supreme Court has reasoned that the right to counsel for one's defense entails having the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

{¶ 72} To that effect, the United States Supreme Court has established the elements required to prevail on an ineffective assistance of counsel claim, which the Ohio Supreme Court has adopted. *See Strickland v. Washington,* 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). One must show two things to succeed on such a claim: (1) counsel substantially violated an essential duty to the client, which requires showing that counsel's representation fell below an objective standard of reasonableness; and (2) the violation prejudiced the defense, which requires showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Bradley* at 141-142.

{¶ 73} Crawford fails to make any argument as to either prong of the *Strickland* test. Further, we reiterate that our review of the record shows that even

if defense counsel had objected to this testimony, there is not a reasonable probability that the outcome of the proceedings would have been different. Therefore, we decline to find that he received ineffective assistance of counsel. Crawford's fifth assignment of error is overruled.

## VI. Closing Arguments

{¶ 74} In his sixth assignment of error, Crawford argues that he was denied a fair trial when the assistant prosecuting attorney made improper statements during closing arguments that violated his constitutional rights. Specifically, Crawford argues that it was improper for the state to provide a "translation" of Crawford's text messages and then argue that he had a "distinctive fingerprint" when communicating through text. Crawford also argues that the state improperly urged the jury to consider the fact that Crawford smoked marijuana with A.H. when it stated "it does show that he was breaking the law."

{¶ 75} Ohio courts have held that "the prosecution is entitled to a certain degree of latitude in summation." *State v. Treesh*, 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001), citing *State v. Grant*, 67 Ohio St.3d 465, 482, 620 N.E.2d 50 (1993). The prosecutor may draw reasonable inferences from the evidence presented at trial, and may comment on those inferences during closing argument. *Id.*, citing *State v. Smith*, 80 Ohio St.3d 89, 111, 684 N.E.2d 668 (1997). In determining whether the allegedly improper remarks were prejudicial to Crawford, we view the state's closing argument in its entirety. *Id.*, citing *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980). Further, when no objection is made

for claims of prosecutorial misconduct, "appellate counsel would be required to show that this testimony and prosecutorial misconduct amounted to plain error." *State v. Newman*, 8th Dist. Cuyahoga No. 107060, 2020-Ohio-658, ¶ 8.

{¶ 76} Because defense counsel did not object to these allegedly prejudicial statements at trial, we review for plain error. With respect to the state's attempt to "translate" Crawford's text messages and point out a distinct writing style, these statements did not affect a substantial right and do not amount to plain error. Instead, the state was merely summarizing the content of the messages and clarifying spelling and grammar mistakes. With respect to the statements about smoking marijuana with A.H., it appears that the state was attempting to argue that this marijuana usage was an attempt to gain A.H.'s trust and develop a relationship with her before sexually abusing her. Viewing the statements in the context of the closing argument in its entirety, and in the greater context of the trial as a whole, we are not persuaded by Crawford's argument that this affected a substantial right. Therefore, Crawford's sixth assignment of error is overruled.

## VII. Motion for Mistrial

{¶ 77} In his seventh assignment of error, Crawford argues that the trial court erred when it denied his motion for mistrial during the discussion of how to address the situation that arose with juror No. 10 during deliberations. He specifically argues that the integrity of the verdict was compromised by forcing juror No. 10 to continue deliberations after she stated that she would be unable to continue deliberating in what she described as a hostile environment.

{¶ 78} The grant or denial of a motion for mistrial rests within the sound discretion of the trial court. *State v. Eddy*, 2017-Ohio-741, 81 N.E.3d 144, ¶ 51 (8th Dist.), citing *State v. Murphy*, 4th Dist. Scioto No. 09CA3311, 2010-Ohio-5031, ¶ 83. The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 79} "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected." *Id.* at ¶ 52, quoting *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). The grant of a mistrial is necessary only when a fair trial is no longer possible. *Id.*, citing *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

{¶ 80} Our review of the record, including the court's prolonged questioning of juror No. 10 about her concerns and her desire to be excused, do not support a conclusion that the trial court's decision to instruct the jury to continue deliberations after juror No. 10 got upset was unreasonable, arbitrary, or unconscionable. The court inquired as to why juror No. 10 considered the jury room a hostile environment and ultimately concluded that while there were likely significant disagreements among the jurors, this would not prevent them from reaching a verdict. Further, after being instructed to continue deliberating and

warned to be polite to each other during deliberations, the jury was able to reach a unanimous verdict. In a poll of the jury, each juror, including juror No. 10, confirmed his or her verdict. Crawford's assertion that juror No. 10's outburst amounted to an irregularity that would preclude a fair trial is not well-taken. For these reasons, Crawford's seventh assignment of error is overruled.

## VIII. Reagan Tokes

{¶ 81} In his eighth and final assignment of error, Crawford argues that the trial court erred by imposing an indefinite sentence pursuant to The Reagan Tokes Law, enacted under S.B. 201 and R.C. 2901.011. Specifically, Crawford argues that his indefinite sentence violates the separation of powers doctrine, his due process rights, and his right to a trial by jury. Crawford's arguments are overruled pursuant to this court's en banc decision in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), which overruled the challenges presented in this appeal to S.B. 201. Therefore, we find that Crawford's sentence pursuant to Reagan Tokes was not a violation of his constitutional rights. Crawford's eighth assignment of error is overruled.

{¶ 82} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
MARY J. BOYLE, J., CONCUR

N.B. Judge Mary Eileen Kilbane joined the dissenting opinion by Judge Lisa B. Forbes and the concurring in part and dissenting in part opinion by Judge Anita Laster Mays in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.

Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.