[Cite as *State v. Komara*, 2023-Ohio-1564.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                    No. 111712

    v.                            :

JOSEPH KOMARA,                          :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 11, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-19-641664-A and CR-22-667097-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Alicia Harrison, Assistant Prosecuting Attorney, *for appellee*.

Rick L. Ferrara, *for appellant*.

LISA B. FORBES, J.:

{¶ 1} Appellant Joseph Komara ("Komara") appeals the trial court's journal entry convicting him of domestic violence and criminal damaging or endangering. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I.  Facts and Procedural History

{¶ 2}  Following a jury trial, Komara was found guilty of domestic violence, a felony of the fourth degree, in violation of R.C. 2919.25(A) with a furthermore specification that he had previously pled guilty or been convicted of domestic violence; and criminal damaging or endangering, a misdemeanor of the first degree in violation of R.C. 2909.06(A)(1) with a furthermore clause that the violation "created a risk of physical harm * * *."

{¶ 3}  Komara appeals his convictions, raising the following two assignments of error:

> The trial court abused its discretion in disallowing rebuttal evidence of defendant's prior, consistent statement to rebut an accusation of recent fabrication and untruthfulness.

> The manifest weight of the evidence did not support a conviction of * * * [domestic violence].

## II.  Trial Testimony

### A. State Witnesses

{¶ 4}  J.D. testified that she was in a relationship with Komara from "May of 2018 to July of 2019, approximately."  J.D. has two daughters, and Komara is the father of the youngest.  J.D. and Komara rented a house together in January 2019.

{¶ 5}  According to J.D., on the morning of July 5, 2019, Komara "made a remark about the McDonald's breakfast being on the table and that [J.D.] didn't make any breakfast for him or buy any food lately."  After the comment, Komara went into the living room.  J.D. followed and "asked him, * * * what's your problem with me today[?]"  Komara replied "because I f*****g hate you and I can't f*****g

stand you." After J.D. tried to determine why Komara said he hated her, Komara "stood up and started * * * coming towards [her] so [she] went into the bathroom * * * where he cornered [her and] just started hitting" her. When Komara was punching J.D., she put her "hands over [her] head" because "he was trying to hit me in my head. And he got me a few times on my head, back of my head and like up here and on my left hand I had a really big welt from trying to defend myself." J.D. recalled that Komara hit her seven to ten times with a closed fist.

{¶ 6} J.D. managed to leave the bathroom, and Komara followed her into the kitchen where the two continued to argue. Komara proceeded to take J.D. "by [her] hair" and "bash [her] face into the tile floor of the kitchen." Komara hit J.D.'s face on the ground four times.

{¶ 7} As soon as the altercation ended, J.D. testified that she packed clothes for herself and her daughters and left the house to stay with her parents. J.D. did not call the police after this altercation because her "biggest concern was just getting [her] daughters like as far away from [Komara] as possible."

{¶ 8} On July 7, 2019, J.D. went back to the house she shared with Komara to "grab some more of my and my daughters' belongings * * *." When J.D. entered the home, she saw Komara on the couch in the living room "laying there with two kitchen knives in his hand." J.D. entered the bedroom and saw that her clothes had been cut and her TV had been smashed. When J.D. asked why Komara had destroyed her belongings, he responded, "[B]ecause [you] deserved it." Afterwards, Komara "stood up and started coming after [her] again and [she] ran in the

bathroom and * * * shut the door and he started hitting the bathroom door with the knives." J.D. stated that she went into the bathroom because "it was the only door that would lock."

{¶ 9} After J.D. knew that Komara was no longer outside the bathroom door, she left the bathroom, grabbed a baby bouncer for her daughter and "told him I was going to the police station to file a police report * * *." In response, Komara "took the baby bouncer seat and * * * slammed it on the kitchen floor and it broke." Komara also "threw a remote," "a glass candy jar," and a "wooden incense burner" at J.D.

{¶ 10} After the altercation, J.D. went to the police station. Police officers took photos of J.D.'s injuries, which were admitted into evidence. J.D. testified that the photos showed bruises to her left hand, arm, shoulder, back, both thighs, right calf, and a "large knot" on her hairline. Asked how she got the bruise on her back, J.D. responded "I'm not sure. It could have gotten there from a tussle in the kitchen when he was trying to bash my head into the kitchen floor." According to J.D., each of the injuries depicted in the photos was inflicted by Komara.

{¶ 11} While at the police station, J.D. made a written statement regarding the incident with Komara. On cross-examination, J.D. acknowledged that she did not mention that Komara had knives in her written statement but "told it to one of the officers." Asked if she mentioned the knives at trial because she "had a knife and * * * attacked" Komara, J.D. responded, "No." Further, J.D. confirmed that she did

not intentionally leave out the mention of knives in her written statement nor did she "make up" the fact that Komara had knives.

{¶ 12} Detective Carl Hartman ("Det. Hartman") testified that in his 27 years as a police officer he has responded to "[c]ountless domestic violence calls" and received training for domestic violence situations. In those situations, victims can be both cooperative and uncooperative with the police.

> It depends on the situation. A lot of times there are victims that are repeat victims that refuse to, for whatever reason, seek help, they refuse to move on with their lives due to situations starting from, you know, monetary reasons where if they lose the main bread winner in the home they will end up homeless with their children. There's emotional reasons that they stay. It also depends on where they are on * * * cycle of * * * domestic violence.

{¶ 13} Det. Hartman testified that he presented the case against Komara to the grand jury. Prior to the grand jury presentation, Det. Hartman reviewed the entire case file. Based on his review, Det. Hartman testified that J.D.'s injuries, as depicted in the photos taken at the police station, were consistent with the reports and statements in the case file.

{¶ 14} On cross-examination, Det. Hartman testified that defendant's Exhibit B was "a screen shot of the CAD system that we use in our department with * * * Komara's name on it. In shows a right heel cut from DV, domestic violence." However, Det. Hartman elaborated that "no report was forwarded to [him] indicating any injuries" sustained by Komara.

{¶ 15} Sergeant Michael Dunegan ("Sgt. Dunegan") testified that he was on duty at the Olmsted Falls police station on July 7, 2019. When J.D. came to make a

report, Sgt. Dunegan recalled that "[s]he was upset. She was crying. Seemed a little bit frazzled, just very upset." J.D. looked "disheveled" and had bruising visible on her left arm.

{¶ 16} J.D. reported to Sgt. Dunegan that on July 5, 2019, she had gotten into an argument with Komara when he noticed "there wasn't food provided for him * * *." The "argument consisted of arguing, yelling back and forth for awhile, name calling back and forth. And that's when the argument became physical, [J.D.] stated that she called [Komara] a worthless piece of s**t and at that time she was chased into the bathroom and was punched numerous times in her head, torso and leg." J.D. explained to Sgt. Dunegan that she did not come to the police after this altercation and, instead, "decided to try to calm things down. She took the kids and left, [and] went to her parents' house * * *." A day or so later, J.D. went back "to the residence to retrieve some items from this house for the kids * * * and that's whenever [Komara], he began throwing things at her" including a glass jar, "incense items," and "a TV remote that struck her [o]n the leg."

{¶ 17} Sgt. Dunegan did not find it unusual that J.D. did not come to the police after the July 5, 2019 incident. "Sometimes people think it's going to get better or this is just going to work itself out. And then a day or two later they come back and, you know, they want to tell the police what happened."

{¶ 18} When J.D. came to the police station on July 7, 2019, Sgt. Dunegan observed "a fresh red mark on her leg." He also observed bruises on left bicep, shoulder, thigh, and side as well as "a small knot and bruise on the left side of her

head." Regarding the bruising on J.D.'s hands, she reported to police that "she had her hands up over her head and that she was getting punched * * *." After J.D. gave her statement, officers took photos of J.D.'s injuries.

{¶ 19} J.D. did not report to Sgt. Dunegan that Komara had a knife during the July 7, 2019 incident. However, according to Sgt. Dunegan, "it's not uncommon to re-interview someone at a later date or time * * * and add to their statement saying, oh, you know, I forgot about this, I forgot to add that. * * * Especially during a traumatic situation * * * where something violent had just happened to [them]." J.D. did not supplement her statement to police.

{¶ 20} Based on the injuries observed by police, they determined that Komara was the primary aggressor. Regarding injuries sustained by Komara, Sgt. Dunegan testified that when Komara was arrested, officers took Komara

> into custody without incident. We did put him into the back of one of our cruisers. At that time [Komara] did state that he was overheated and hot, he stated that the air conditioning wasn't on. The other officers on scene did check and the car was running and the AC was on. But based off of that we did have our fire department come over and check him and there was nothing, you know, no reported injuries. He didn't want to go to the hospital or anything like that. And we did offer him a chance to get a statement on his side and he said — he refused.

Further, Sgt. Dunegan did not observe any injuries on Komara when he was taken into custody.

## B. Defense Witness

{¶ 21} Komara testified in his own defense. According to Komara, on July 5, 2019, he and J.D. began arguing after J.D. discovered "messages in [his] phone from another girl that morning and she confronted [him] about" them. He testified that

J.D. "was crying and she was very hysterical. And at that point she had a knife in her hand." J.D. then "lunged at [him] with the knife and [he] threw [his] legs up [and] had a big cut on [his] leg after that." Komara described the knife as "small, almost like a filet knife."

{¶ 22} The two continued to argue and then they "both started hitting each other * * *." J.D. "tackled" Komara into a chair, and he "laid [his] hands on her a few times after that. * * * It was just self-defense." After Komara got up from the chair, the two "both started kind of fighting" until he ultimately pushed her. The two began arguing and fighting again when Komara "pushed [J.D.] into the wall and fought back, you know, after she cut [him] on the leg." Asked what he meant by "fought back," Komara responded "I pushed her into the wall and I hit her in the arm a couple times. And she was kind of hitting me back, too, at the same time and we ended up kind of tackling each other to the floor." At some point during the fight, Komara stated that the knife had fallen to the ground. After the fight ended, J.D. "went into the bedroom and [he] went back and sat on the couch" until J.D. left the house.

{¶ 23} Komara stated that he "kind of antagonized [J.D.] to react" on July 5, 2019. Asked if Komara felt like J.D. "deserved * * * bruises all over her body," Komara responded, "No. I don't think anyone, you know, deserves to go through that kind of stuff * * *."

{¶ 24} Komara was shown defendant's Exhibit B, which he identified as a photo of his leg with a cut on it. Komara stated that the cut "occurred on July 5th during the altercation with [J.D.]."

{¶ 25} On July 7, 2019, according to Komara, J.D. "messaged [Komara] telling [him] that she was coming to get all of her stuff and that [he] would never see [his] daughter ever again." Komara testified that when J.D. entered the home, the two began arguing and saying "hurtful things" to each other. Komara stated that he did not have knives on him during this altercation. Further, there was no physical altercation on that day. Komara was arrested later that day at his home.

{¶ 26} On cross-examination, Komara was asked whether his testimony was the first time he mentioned J.D. having a knife during the altercation. Komara responded, "No, I pretty much stated this since I've been arrested and they said the fact that was — the argument started over McDonald's breakfast. That couldn't be. That had nothing to do with that." The following colloquy occurred in response:

> Prosecutor: You're saying when you were with the Olmsted Falls police you told them there was a knife on [J.D.]?
>
> Komara: I didn't tell them anything. I kept my mouth shut. I didn't talk to any of the police.
>
> * * *
>
> Prosecutor: Fact of the matter is, Mr. Komara, we hadn't heard anything about this knife until [J.D.] took the stand and said that you had a knife on the 7th, right?
>
> Komara: Well, I had told the police officers that's how I got the cut on my leg was from a knife.
>
> * * *

Prosecutor:  Mr. Komara, * * * I asked that you're claiming someone came at you with a knife and you didn't think that was a big enough deal to tell the police?

Komara:  No, I didn't.

Prosecutor:  No, you didn't. Not until we're here in this courtroom today and someone else is making allegations against you, right?

Komara:  Right.

Prosecutor:  Now you want to tell these ladies and gentleman of the jury that she came [at you with] a knife for the first time?

Komara:  Yes.

* * *

Komara:  I went to the police station, they just threw me in a cell and didn't — they asked me if I was going to talk to them and I said no.  And then they just kind of threw me in the cell, they didn't examine me or anything like that.

Prosecutor:  That's not entirely true, Mr. Komara, because you asked them to take that picture of your injury, right?

Komara:  That was after, after I got to the jail, the Strongsville jail.

Prosecutor:  You told them there's injuries on me.  Take a picture of my injury so I could tell them about this case?

Komara:  Yeah

{¶ 27} Komara stated that he had "been waiting to tell" his side of the story, namely that J.D. had a knife, since the altercation happened and that he "couldn't really tell the police that at the time of getting arrested because, you know, [he] had to take care of moving all [of his] stuff and trying to save [his] job and stuff like that."

{¶ 28} On re-direct, Komara was asked, "I think you started to say that you did tell an officer about what happened that day, right?"  Komara answered, "I don't

really recollect everything that I had talked to the police about that day." Komara's lawyer asked if he "suggested something about [J.D.] having a knife?" Komara responded, "I don't believe I did. If I did, it would have been, you know, at the jail when they were taking me at the jail."

## III. Law and Analysis

### A. Rebuttal Evidence

{¶ 29} With his first assignment of error, Komara asserts the trial court abused its discretion when it disallowed rebuttal evidence of prior consistent statements by Komara to respond to the prosecution's accusation of recent fabrication. "The decision whether to admit or exclude evidence is subject to review under an abuse-of-discretion standard, and reviewing courts will not disturb evidentiary rulings absent a clear showing that the trial court abused its discretion and materially prejudiced a party." (Citations omitted.) *State v. Crawford*, 8th Dist. Cuyahoga No. 110986, 2022-Ohio-2673, ¶ 52. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Trial "courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 39.

{¶ 30} Evid.R. 801(D)(1) provides that a prior out of court statement made by a witness is excluded from the definition of hearsay if "[t]he declarant testifies at

trial * * * and is subject to examination concerning the statement and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive * * *."

{¶ 31} Komara argues that "[t]he trial court denied the defense motion to recall officer Spagnola, apparently on the grounds the report did not say anything specific about a knife." As an initial matter, we note that the record does not demonstrate that the trial court made a specific ruling denying Komara's request to call Officer Spagnola as a rebuttal witness or to introduce any report. After Komara's testimony, the court and Komara's trial attorney had the following discussion at sidebar:

> The Court: Just before we broke we had a sidebar where [Defense Counsel] had requested to bring back a witness or call another witness from the Olmsted police concerning a portion of the report that indicated that Mr. Komara had told an officer about the gash on the back of his heel and about the necessity of bringing this officer back. We had talked about the fact that the Exhibit B I think it is.
>
> Defense Counsel: Yes, Judge.
>
> The Court: Was taken as a result of that conversation, so the fact that, you know, it was noted at that time, that that was a part of the injuries that Mr. Komara says was as a result of the altercation with the victim here.
>
> Defense Counsel: Yes, Judge, that's correct. And I think if I could just proffer from the police report exactly what is written and this is Officer Spagnola said "[Komara] explained to me his foot was cut on Saturday, July 6th, 2019, during an argument he was having with [J.D.], live-in girlfriend. [Komara] explained he was cut by [J.D.] during the altercation." Judge, that's the portion that I was attempting to call another witness to describe to the jury. * * * The portion that I was more concerned with is the notion that on cross examination the State

has elicited that maybe a theory that [Komara] just came up with a knife today and that's the portion that I was uncomfortable with and why I wanted to call the additional officer.

The Court: All right. Well, there's nothing in that report that says a knife, does it?

Defense Counsel: Judge, written in the report there is not. However, there is that he was cut by [J.D.] during the altercation. And I would suggest that if he's cut by [J.D.] during the altercation —

The Court: Well, the picture would demonstrate the fact that he alleges that there was a cut.

Defense Counsel: Yes, Judge. Just for the record, the record could note my objection.

The Court: Okay. Do you have any other witnesses?

Defense Counsel: We do not, Judge.

{¶ 32} To the extent that Komara was precluded from calling a witness or introducing an exhibit, we note that, at trial, Komara was inconsistent regarding whether he reported anything to the police concerning J.D. having a knife or cutting him. Komara testified multiple times during trial that he never reported to the police that J.D. had a knife. When asked if he told the police that J.D. had a knife, Komara testified that he kept his "mouth shut," "didn't talk to any of the police," and that he did "not believe" he told an officer J.D. had a knife. He also testified he told the police he had been cut during the altercation with J.D. which resulted in the photo of his cut being taken at the jail, which was introduced into evidence as defendant's Exhibit B.

{¶ 33} For a statement to be a prior consistent statement and deemed nonhearsay, the statement must be consistent with the witness's testimony at trial

and offered to rebut an argument of recent fabrication. *See* Evid.R. 801(D); *State v. Lewis*, 2017-Ohio-7480, 96 N.E.3d 1203, ¶ 24 (8th Dist.). The rebuttal evidence Komara complains was wrongly excluded — testimony of a police officer as to what Komara told him or a police report indicating Komara mentioned to the police that J.D. had a knife during the July 5, 2019 altercation — would be both consistent and inconsistent with Komara's testimony at trial.

{¶ 34} We note that the picture of Komara's cut that was the subject of interrogation at trial was introduced into evidence as defendant's Exhibit B. Komara testified that the picture was taken at the police station. Text on Exhibit B indicated the picture depicted a "right heel cut from DV, domestic violence." Under these circumstances, we find that the trial court did not abuse its discretion to the extent that it disallowed testimony of a police officer or introduction of a police report.

{¶ 35} Komara's first assignment of error is overruled.

**B. Manifest Weight**

{¶ 36} In his second assignment of error, in which Komara claims his conviction for domestic violence was against the manifest weight of the evidence, Komara argues that the "jury lost its way in finding the State proved beyond a reasonable doubt that [Komara] did not act in self-defense." Komara claims that because he testified that J.D. was the aggressor of the altercation and J.D. testified that he was the aggressor, "[t]here is no manner by which the jury could reasonably determine beyond a reasonable doubt that one person was right and the other wrong." We disagree.

{¶ 37} A challenge to the manifest weight of the evidence "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 38} Pursuant to R.C. 2901.05, self-defense is defined as follows:

(B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 39} In other words, when a defendant properly raises self-defense, the burden shifts to the state, which, to sustain a conviction, must prove beyond a reasonable doubt that the defendant (1) was at "fault in creating the situation giving rise to the affray"; (2) "did not have a bona fide belief that he or she was in imminent

danger of death or great bodily harm and that his or her only means of escape from such danger was in the use of force"; or (3) "must not have violated any duty to retreat or avoid danger." *State v. Jackson*, 8th Dist. Cuyahoga No. 108493, 2020-Ohio-1606, ¶ 17; *State v. Walker*, 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037, ¶ 13 ("in light of the cumulative nature of the self-defense elements, the state need only disprove one of the elements of self-defense beyond a reasonable doubt at trial to sustain its burden * * *").

{¶ 40} Komara testified that J.D. "lunged" at him with a knife that resulted in the two fighting, hitting each other, and tackling each other. However, the jury also heard J.D.'s testimony that on July 5, 2019, Komara followed her from the living room into the bathroom where he cornered her and hit her repeatedly with a closed fist. J.D. managed to leave the bathroom, and Komara again followed her, this time into the kitchen where he bashed her face onto the floor approximately four times. The jury was shown photographs taken by Olmsted Falls police officers of J.D.'s injuries, including bruises on her arm, leg, back, and hands and a knot on her head.

{¶ 41} While showing Komara the photo of the cut Komara claimed he received from J.D., the prosecutor asked, "This maybe inch or two cut, this is what you're saying caused you to defend yourself that day?" Komara answered, ""Yes." Notwithstanding his argument on appeal that J.D. was the initial aggressor, Komara testified that he "antagonized" J.D. to react on July 5th, 2019, and that he did not feel as though J.D. "deserved" all of the bruises on her body.

{¶ 42} "A jury may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Doyle*, 8th Dist. Cuyahoga No. 84575, 2005-Ohio-2006, ¶ 9. In light of the evidence presented at trial, we find that a reasonable jury could conclude that Komara did not act in self-defense. We do not find the jury's decision rejecting Komara's claim of self-defense and convicting him of domestic violence to be a manifest miscarriage of justice where the jury clearly lost its way.

{¶ 43} Accordingly, Komara's second assignment of error is overruled.

{¶ 44} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
SEAN C. GALLAGHER, J., CONCUR